## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUITAS DISABILITY ADVOCATES,
LLC,

*Plaintiff*,

v.

DALEY, DEBOFSKY & BRYANT, P.C.;
JONATHAN FEIGENBAUM,

*Defendants*.

Civil Action No. 15-611 (RDM)

## <u>MEMORANDUM OPINION</u>

Plaintiff Equitas Disability Advocates, LLC was formerly engaged in the practice of law.

Dkt. 2-4 at 23 (Abeles Aff. ¶ 2).  Its affairs are being wound up by its only remaining principal,

Brian Abeles.  *Id.*  Defendant Jonathan M. Feigenbaum is a Boston lawyer, Dkt. 16-2 at 1

(Feigenbaum Aff. ¶ 3), and Defendant Daley, Debofsky & Bryant, P.C. ("DDB") was an Illinois

law firm until it was dissolved by the Illinois Secretary of State in 2013, Dkt. 2 at 4.  This case

arises out of an arbitration regarding legal fees that Feigenbaum and DDB ("Defendants")

purportedly owed Equitas based on two fee-sharing agreements.

Presently before the Court are Equitas's motion to vacate the arbitration award, which

was pending when Defendants removed this action from the D.C. Superior Court, Dkt. 2-4 at 4;

Equitas's motion to remand the case to the Superior Court, Dkt. 14; and Defendants' motion to

confirm the arbitration award, Dkt. 17.  Equitas contends that this case must be remanded

because the parties' agreements specify that D.C. law governs and that the arbitration will be

held in D.C., and under D.C.'s Revised Uniform Arbitration Act ("DCRAA"), the Superior

Court has "exclusive jurisdiction" to enter judgment on an arbitration award when the

"agreement to arbitrate provid[es] for arbitration in the District of Columbia."  D.C. Code §§ 16-4426(b), 16-4401(5); *see* Dkt. 14-1.  Equitas also contends that it is entitled to vacatur of the arbitration award under the DCRAA because the arbitrator improperly denied a postponement of the arbitration proceedings.  Dkt. 2-4 at 19.  Defendants respond that the "choice of [D.C.] law [in the agreements] was only intended to govern any . . . disputes arising from the underlying agreements between the parties" and does not affect "the governing law for confirmation of or challenge to any arbitration award."  Dkt. 15 at 5.  In Defendants' view, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs such proceedings and, under the FAA, Equitas's motion to vacate is untimely.  Dkt. 16-1 at 3–4.  Defendants further contend that irrespective of whether the FAA or the DCRAA applies, the arbitrator's denial of a postponement withstands scrutiny and, accordingly, the motion to confirm must be granted.  *Id.* at 5–17.

For the reasons that follow, Equitas's motions to remand the case, Dkt. 14, and to vacate the arbitration award, Dkt. 2-4 at 4, are **DENIED**, and Defendants' motion to confirm the arbitration award, Dkt. 17, is **GRANTED**.

## I. BACKGROUND

### A.    The Agreements

Brian Abeles previously worked in the disability-insurance industry as an insurance broker, benefits consultant, and claims consultant, which enabled him to amass over 100,000 pages of industry documents providing insight into theories of recovery for disability-insurance claimants.  Dkt. 2-4 at 31–32.  Although Abeles is not a lawyer, *id.* at 23 (Abeles Aff. ¶ 3), he believed that access to these documents, known as "the Archive," could be useful to disability-insurance lawyers and their clients, *id.* at 31–32.  He thus sought to partner with lawyers who could use the Archive to pursue recoveries for their clients.  *Id.* at 32.  Abeles ultimately co-

founded the D.C. law firm Fulcrum Law Group, LLC, with attorney Joshua Rose.[1]  *Id.* at 31.

Fulcrum is the predecessor-in-interest of Plaintiff Equitas.  *Id.* at 34 n.4.  Fulcrum entered into

two agreements with Defendants Feigenbaum and DDB in May and June of 2008, to which

Equitas later became a party.  *See* Dkt. 9-2 at 25–63.  Pursuant to the Strategic Alliance Co-

Counsel Agreement ("SACCA") and the Fulcrum-Alliance Archive Sublicense Agreement

("FAASA"), Defendants obtained access to the Archive and to consultant and/or co-counsel

services in exchange for a percentage of the fees recovered in specified cases.  *See id.*; Dkt. 2-4

at 31, 33.  The SACCA included choice-of-law and arbitration clauses:

> (g)  Governing Law; Dispute Resolution.  This Agreement shall be
> deemed to have been entered into under the laws of the District of Columbia, and
> the rights and obligations of the parties hereunder shall be governed and
> determined according to the laws of said state without giving any effect to conflict
> of laws.  All disputes arising under or in connection with this Agreement or
> involving the interpretation, performance or breach of this Agreement will be
> finally settled by final and binding arbitration administered by and in accordance
> with the then existing [Judicial Arbitration, Mediation, and ADR Services
> ("JAMS")] Streamlined Arbitration Rules and Procedures[] (the "Rules of
> Arbitration") by a single arbitrator appointed in accordance with the Rules of
> Arbitration.  Any such arbitration shall be held in Washington, DC, unless the
> parties hereto mutually agree in writing upon some other location for arbitration.
> There shall be no consolidation of this arbitration with any other dispute or
> proceeding involving third parties.  The provisions of this Agreement shall prevail
> in case of inconsistency between the Rules of Arbitration and this Agreement.
> Judgment may be entered into in any court of competent jurisdiction to enforce
> any final decision by the arbitrators.

Dkt. 9-2 at 39.  The FAASA included similar provisions, which are, for purposes of this case,

materially indistinguishable from the SACCA provisions.[2]  *Id.* at 57.

---

[1]  The D.C. Rules of Professional Conduct ("DC RPC") permit non-lawyers to retain a financial
interest or managerial authority in a law firm in certain circumstances.  *See* DC RPC Rule 5.4(b).

[2]  The FAASA provides as follows:

> 17.2  Governing Law; Dispute Resolution.  This Agreement will be
> deemed to have been entered into under the laws of the District of Columbia, and
> the rights and obligations of the parties hereunder will be governed and

B.      Arbitration Proceedings

On December 20, 2013, Equitas, represented by the law firm Zuckerman Spaeder, demanded arbitration against Defendants pursuant to the SACCA and FAASA, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and fraud, and seeking return of all Archive documents.[3]  Dkt. 2-4 at 38–39; *id.* at 24 (Abeles Aff. ¶ 9).  Equitas alleged that DDB and Feigenbaum had failed to pay Equitas its share of the fees earned in cases allegedly covered by the SACCA and FAASA.  *Id.* at 33.  An arbitrator was assigned on February 6, 2014.  *Id.* at 45.

After a hearing on May 20, 2014, the arbitrator dismissed Equitas's claims for unjust enrichment and fraud for failure to state a claim.  *Id.* at 8; Dkt. 16-3 at 3.  Subsequent to briefing on the construction of the parties' agreements, the arbitrator issued a decision on August 6, 2014,

---

determined according to the laws of the District of Columbia without giving any effect to conflict of laws.  All disputes arising under or in connection with this Agreement or involving the interpretation, performance or breach of this Agreement will be finally settled by final and binding arbitration administered by and in accordance with the then existing JAMS Streamlined Arbitration Rules and Procedures[] (the "Rules of Arbitration") by a <u>single arbitrator</u> appointed in accordance with the Rules of Arbitration.  Any such arbitration shall be held in Washington, DC, unless the parties hereto mutually agree in writing upon some other location for arbitration.  There shall be no consolidation of this arbitration with any other dispute or proceeding involving third parties.  The provisions of this Agreement will prevail in case of inconsistency between the Rules of Arbitration and this Agreement.  Judgment may be entered into in any court of competent jurisdiction to enforce any final decision by the arbitrators.

Dkt. 9-2 at 57.

[3]  Equitas also demanded arbitration against Frederick Daley, Mark DeBofsky, and David Bryant in their personal capacities, but the arbitrator dismissed the claims against them because they were not parties to the SACCA and FAASA.  Dkt. 2-4 at 8; *id.* at 24 (Abeles Aff. ¶ 5).  Equitas filed a separate action against the three individuals, which was dismissed by another judge of this Court on September 29, 2015.  *See Equitas Disability Advocates, LLC v. Bryant*, No. 14-1644, 2015 WL 5728365 (D.D.C. Sept. 29, 2015), *appeal dismissed*, No. 15-7127, 2015 WL 9310483 (D.C. Cir. Dec. 4, 2015).

concluding that there remained material questions of fact with respect to Equitas's claims for breach of contract and breach of the covenant of good faith and fair dealing.  Dkt. 2-4 at 8.  The arbitrator explained that Defendants were asserting a unilateral-mistake defense based on the deletion of a key sentence limiting the scope of the cases covered from a prior draft of the SACCA and that the question of who was responsible for the sentence's deletion "cannot be resolved on the papers."  Dkt. 16-3 at 3.  He also cautioned that "[t]his matter has already greatly exceeded the reasonable expectations of the parties when they agreed to proceed under the JAMS Streamlined Arbitration Rules" and that "[t]he merits hearing of this case must be scheduled and conducted without further delay."  *Id.* at 3–4.

On August 15, 2014, by agreement of the parties, a hearing was scheduled for the week of December 8, 2014.  Dkt. 2-4 at 46.  At the same time, JAMS informed the parties that "[a]ll fees must be paid by 10/9/14 to proceed with the . . . hearing;" that "[a]ny cancellation or continuance must be approved by the arbitrator;" and that if the hearing was canceled or continued after October 9, "the party canceling or continuing the hearing is responsible for all fees associated with the reserved time" unless JAMS could otherwise fill it.  *Id.* at 46.  On October 9, 2014, JAMS reminded the parties that payment was due and that it was the last day to cancel the hearing without incurring cancelation fees.  *Id.* at 47.  Equitas paid its share of the fees that day.  *Id.* at 63.  Defendants, however, did not pay their share of the fees at that time.  *Id.* at 62.

According to Abeles, in mid-October 2014, he realized that Equitas's relationship with Zuckerman Spaeder "had to end."  *Id.* at 25 (Abeles Aff. ¶ 13).  The relationship had deteriorated after the lead attorney on the matter left the firm during the preceding summer.  *Id.*  Equitas learned in mid-June 2014 that the lead attorney planned to depart, and she left Zuckerman

Spaeder on July 1, 2014. *Id.* at 61. On October 14, 2014, Abeles notified the JAMS case administrator that Zuckerman Spaeder was withdrawing from the case and that he "was certain that Equitas would need a postponement of the hearing." *Id.* at 25 (Abeles Aff. ¶ 15). During the last week of October, the case administrator allegedly told Abeles that the arbitration hearing would likely be canceled anyway because Defendants had not paid their share of the fees. *Id.* at 25–26 (Abeles Aff. ¶ 16); *see also id.* at 62. Abeles replied that Equitas would not advance Defendants' share of the fees. *Id.* at 26 (Abeles Aff. ¶ 16). Under the JAMS Streamlined Arbitration Rules, "JAMS may order the suspension or termination of the proceedings" if a party fails to pay and no other party advances the payment owed.[4] Equitas did not, however, move for a continuance at that time.

On October 30, 2014, JAMS notified the parties that if payment was not received by November 7, 2014, the hearing would be canceled. Dkt. 2-4 at 48. Defendants then paid their share of the fees on November 7, and JAMS informed Abeles of this "[a] few days later." *Id.* at 26 (Abeles Aff. ¶ 19). On November 11, 2014, Abeles told the case administrator that he had not retained new counsel and would need a postponement of the hearing. *Id.* (Abeles Aff. ¶ 20). The administrator "asked that Equitas put that in writing" but allegedly agreed to inform the arbitrator and Defendants. *Id.* at 63. Zuckerman Spaeder provided formal notice of its withdrawal on November 14, 2014. *Id.* at 26–27 (Abeles Aff. ¶ 22); *id.* at 53.

On the evening of November 26, 2014, the day before Thanksgiving, Equitas finally moved for a postponement of the hearing. *Id.* at 56. Abeles stated that the postponement was needed because "Equitas has had to change counsel" which "became necessary when one of the

---

[4]   *See* Rule 6, *available at* http://www.jamsadr.com/rules-streamlined-arbitration/#Rule6; *see also* Dkt. 2-4 at 26 (Abeles Aff. ¶ 16).

key members on [its] legal team left Zuckerman Spaeder." Dkt. 16-3 at 33.  He further explained that "[a]though [they] immediately began exploring the options and conferring with other firms . . . , that process is not complete and, in any event, [their] new counsel will need additional time to become familiar with the case." *Id.*

Defendants opposed any continuance. *Id.* at 35.  In a November 28, 2014 letter to the arbitrator, they explained that they had been preparing for the hearing, that they had rearranged their schedules and bought non-refundable flights, that a witness had rearranged his schedule to attend, and that Equitas had long been on notice of the need to seek new counsel. *Id.* at 35–37. As Defendants explained, Equitas's lead attorney had left Zuckerman Spaeder in July 2014. *Id.* Defendants also represented that Abeles had consented to the withdrawal of the firm's representation of Equitas in closely related litigation in D.C. Superior Court on August 26, 2014, and Equitas had successfully obtained new counsel in that litigation. *Id.*; *see also supra* p.4 n.3 (explaining related litigation); Dkt. 16-3 at 20–23 (notice of withdrawal); *Equitas Disability Advocates, LLC v. Bryant*, No. 14-1644 (D.D.C. Oct. 7, 2014), Dkt. 3 (notice of appearance). Although Defendants opposed any continuance, they asserted that if one was granted, Equitas should be responsible for the costs incurred to reschedule, including the cost of their airline tickets, hotel rooms, and the arbitrator's fees. Dkt. 2-4 at 58.  The arbitrator denied the request for a postponement on December 1, 2014. *Id.* at 59.  He explained that Defendants had booked non-refundable travel, that they had prepared for trial, that they should be permitted to present their affirmative defense "without further delay," and that the "proceeding had been anything but streamlined so far." *Id.*

Equitas sought reconsideration of the denial on December 4, 2014, *id.* at 60, and Defendants in turn reaffirmed their opposition to a postponement, Dkt. 16-3 at 39.  In its motion

for reconsideration, Equitas did not dispute that Abeles had prior notice that Zuckerman Spaeder would withdraw, but argued that "Equitas continued to incur legal expenses with Zuckerman while [Defendants] withheld payment from JAMS." Dkt. 2-4 at 62. It further argued that a postponement was appropriate because Defendants "used their failure to pay JAMS fees to lull Equitas into thinking that it had time to obtain new counsel." *Id.* at 60. Equitas also explained that Abeles had previously communicated to the JAMS case administrator that Equitas was seeking new counsel and would need a postponement. *Id.* at 63. With respect to Defendants' contention that Equitas should be responsible for the costs of any continuance, Equitas stated only that "[w]hat [Defendants] have at stake in time and expenses is de minimis when compared against the damage incurred by Equitas as a result of their wrongful and deceptive practices." *Id.* The arbitrator denied the request for reconsideration on Friday, December 5, 2014, *id.* at 65–67, stating that "[i]t is far too late for a continuance" and that they would "begin on Monday morning with whatever we have." *Id.* at 65. He explained that if Equitas had no evidence to present, the case would proceed with respect to Defendants' affirmative defense and that "if [he] agree[d] that [Equitas's] failure to present evidence [was] excusable, [he] [would] consider . . . adjourning the proceeding until [Equitas] can proceed." *Id.*

The arbitration hearing proceeded as scheduled, and Abeles, without counsel, participated in it on behalf of Equitas. Dkt. 2-4 at 28 (Abeles Aff. ¶ 28). The parties were given until December 12, 2014 to present any additional materials, and Equitas did submit further affidavits. *Id.* at 8; Dkt. 16-1 at 13. On December 15, 2014, the arbitrator ruled that Defendants had prevailed on their affirmative defense and that Equitas was not owed any money. Dkt. 2-4 at 10–12. He also ordered Equitas to reimburse Defendants for their portion of the arbitration fees— $24,562.06. *Id.*

8

C.      **Judicial Proceedings**

On February 12, 2015, Feigenbaum and DDB filed a motion to confirm the arbitration award in Massachusetts Superior Court, which was served on Equitas on February 23, 2015. Dkt. 16-3 at 46; Dkt. 18-1 at 1.  On March 13, 2015, Equitas filed a motion to vacate the arbitration award in D.C. Superior Court.  Dkt. 2-4 at 8.  Equitas's motion was based on the arbitrator's allegedly improper denial of a postponement.  *Id.* at 19–21.  Two weeks later, Equitas filed a "Motion to Enlarge Time" in the Massachusetts proceeding, explaining that "the resolution of the Motion to Vacate by the Superior Court for the District of Columbia will obviate any basis for [Feigenbaum and DDB] to proceed with their Complaint in this Court." Dkt. 9-2 at 76.  Feigenbaum and DDB opposed the motion.  *See id.* at 78–85.  On May 15, 2015, after oral argument, the Massachusetts Superior Court entered an order deferring to the D.C. action, stating that "[w]hile nothing prohibits this court from confirming an arbitration award from the District of Columbia, that venue is most appropriate to adjudicate confirmation/vacatur as [the] award was issued there."  Dkt. 16-3 at 46; *see also* Dkt. 16-1 at 14.

Meanwhile, on April 23, 2015, Defendants removed the D.C. Superior Court action to this Court based on the Court's diversity jurisdiction.  Dkt. 2 at 3–4.  On April 29, 2015, they filed a motion to stay this action pending the Massachusetts action, which the Court denied in light of their failure to comply with the meet-and-confer requirements of Local Rule 7(m).  Dkt. 9; May 6, 2015 Minute Order.  On May 6, 2015, Defendants filed an amended motion to stay this proceeding, but they withdrew that motion on May 22, 2015, after the Massachusetts court issued its ruling deferring to this action.  Dkts. 12–13; Dkt. 16-3 at 46.

On May 22, 2015, Equitas filed a motion to remand the case to D.C. Superior Court, Dkt. 14, which Defendants opposed, Dkt. 15.  On June 8, 2015, Defendants filed a motion to confirm

the arbitration award, Dkt. 17, which Equitas opposed, Dkt. 21.  The parties' motions to remand the action and to vacate or confirm the arbitration award are, accordingly, now ripe for adjudication.

## II.  ANALYSIS

### A.    Subject-matter Jurisdiction

"Although the Federal Arbitration Act (FAA) constitutes federal law, 'the Supreme Court has interpreted the statute as not itself bestowing jurisdiction on the federal district courts.'" *Karsner v. Lothian*, 532 F.3d 876, 882 (D.C. Cir. 2008) (quoting *Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1245–46 (D.C. Cir. 1999)).  Here, however, 28 U.S.C. § 1332, which confers diversity jurisdiction on the federal courts, establishes this Court's jurisdiction to adjudicate this case.  The parties are "citizens of different States" within the meaning of that statute.  28 U.S.C. § 1332(a)(1); *see also id.* § 1332(c)(1).  It is undisputed that Equitas is a D.C. LLC whose sole remaining member, Abeles, is a citizen of Florida; that DDB was incorporated in Illinois and had its principal place of business there; and that Feigenbaum is a citizen of Massachusetts.  Dkt. 2 at 3–4.

Moreover, "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332(a).  The D.C. Circuit follows the "demand approach" to determining the amount in controversy in an action to confirm or vacate an arbitration award, *Karsner*, 532 F.3d at 884, under which "the amount in controversy is the amount sought in the underlying arbitration rather than the amount awarded," *id.* at 882.  As a result, even though Equitas lost the arbitration and was ordered to pay only $24,562.06 to Defendants, Dkt. 2-4 at 94, the amount-in-controversy requirement of § 1332(a) is met because Equitas originally sought

damages in excess of $75,000, *see* Dkt. 2 at 4; Dkt. 2-4 at 35–38 (seeking 20–50% of the legal

fees incurred in a case that settled for $1,000,000, as well as fees incurred in other litigations).

The Court, accordingly, concludes that it has subject-matter jurisdiction over the parties'

dispute.

## B.     Motion to Remand

Equitas contends that the case must, nonetheless, be remanded to the D.C. Superior Court

because the choice-of-law provisions of the SACCA and FAASA also serve, by operation of

D.C. law, as forum-selection clauses conferring exclusive jurisdiction on that court.  *See* Dkt. 14-

1 at 3–7.  To understand Equitas's argument, a bit of background is required.  The SACCA and

FAASA clauses on "Governing Law; Dispute Resolution" state that "the rights and obligations

of the parties hereunder shall be governed and determined according to the laws of" the District

of Columbia "without giving any effect to conflict of laws," and that any "arbitration shall be

held in Washington, DC, unless the parties hereto mutually agree in writing upon some other

location."  Dkt. 9-2 at 39, 57.  Less than six months before the parties entered into the SACCA

and FAASA, the District of Columbia adopted the DCRAA, which includes the following

provision:  "An agreement to arbitrate providing for arbitration in the District of Columbia

confers exclusive jurisdiction on the court to enter judgment on an award under this chapter."

D.C. Code § 16-4426(b); *see* Dkt 9-2 at 43, 48 (dating agreements to May and June 2008).

"Court" is defined elsewhere in the DCRAA as "the Superior Court of the District of Columbia."

D.C. Code § 16-4401(5).  The DCRAA further provides that "[b]efore a controversy arises that is

subject to an agreement to arbitrate, a party to the agreement may not waive or agree to vary the

effect of" the foregoing provision on "exclusive jurisdiction."  *Id.* § 16-4404(b)(1).

Equitas contends that because the parties selected D.C. law to govern their disputes and selected D.C. as the location for the arbitration, the DCRAA applies to this case and vests exclusive jurisdiction in the D.C. Superior Court.  As Equitas explains its position, "by virtue of having agreed to arbitrate in D.C., and to be governed by D.C. law, the parties also agreed that the D.C. Superior Court would be the exclusive forum for review of any arbitration award."  Dkt. 14-1 at 7.  Defendants offer two arguments in response:  (1) that the FAA preempts the relevant provisions of the DCRAA, Dkt. 15 at 2–3; and (2) that Equitas "is asking this Court to rewrite the agreements and insert a forum[-]selection clause," *id.* at 6.

1.   *Preemption*

Defendants' first contention falls wide of the mark.  They assert that "Equitas'[s] motion to vacate the [a]ward under the D.C. Arbitration Act is preempted under the FAA," *id.* at 2, and that "state arbitration laws must yield to the FAA when the dispute involves interstate commerce," *id.* at 3.  The Court agrees that the contracts at issue fall within the scope of the FAA, which applies to "contract[s] evidencing a transaction involving commerce" and provides that an arbitration provision in such contracts is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *see also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277 (1995) (interpreting the phrase "involving commerce" in § 2 as "signal[ing] an intent to exercise Congress' commerce power to the full").  That, however, is only the first step in the analysis.  The Supreme Court has recognized three forms of preemption: "express" preemption, "field" preemption, and "conflict" preemption.  *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).  Because the FAA does not contain an express preemption clause and does not preempt the entire field of arbitration, *see Volt Info. Scis. Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S.

468, 477 (1989), Defendants' argument comes down to a claim of conflict preemption.  Conflict

preemption, in turn, applies in circumstances where it is impossible to comply with conflicting

federal and state rules, *see*, *e.g.*, *Fla. Line & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–

43 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the

full purpose and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  "The

question before" the Court, "therefore, is whether application of" D.C. Code § 16-4426(b) to

require that an action to confirm or vacate an arbitration award be brought in D.C. Superior

Court would directly conflict with the terms of the FAA or would "undermine the goals and

policies of" the Act.  *Volt*, 489 U.S. at 477–78.  As explained below, the Court concludes that it

would not.

    As an initial matter, it is clear that the choice-of-forum rule contained in D.C. Code § 16-

4426(b) does not directly conflict with the FAA.  The FAA provides that "the United States court

in and for the district wherein the award was made may make an order vacating the award."  9

U.S.C. § 10(a).  Likewise, the Act provides that the federal district court for the district in which

the award is made "may make an order modifying or correcting the award," *id.* § 11, and, "[i]f no

court is specified in the agreement of the parties, then" an application to confirm the award "may

be made to the" federal district court "within which such award was made," *id.* § 9.  As the

Supreme Court has explained, "the three venue sections of the FAA are best analyzed together,"

and, in light of the legislative history of the Act, it is evident that all three provisions are

permissive, not mandatory.  *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193,

198–204 (2000).  Most notably, § 9 expressly contemplates that the parties to an arbitration

agreement may agree to an alternative venue for bringing a confirmation proceeding, and, as the

Supreme Court explained, there is no basis to believe that Congress intended that confirmation

proceedings might be brought in one venue, while vacatur proceedings must be brought in another. *Id.* at 200–201.

It is possible that a state law mandating that confirmation, vacatur, or modification proceedings must be brought in a state forum and precluding the parties from contractually agreeing otherwise might conflict with even the permissive view of the FAA's venue provisions. And, at first blush, the language in D.C. Code § 4404(b), which precludes a party to an arbitration agreement from waiving the applicability of D.C. Code § 16-4426 before a dispute subject to the arbitration requirement arises, might be seen to cross that line. But that is not how the parties present the issue, and it is not how the Court understands it. Rather, Equitas's contention that D.C. law applies here is premised on the claim that the SACCA and FAASA affirmatively incorporate DC law into the parties' agreement; Equitas does not argue that D.C. law applies of its own force and *despite* the parties' agreement, but rather that it applies *because of* their agreement. *See* Dkt. 14-1 at 7. With the issue so framed, Defendants cannot plausibly claim that the D.C. choice-of-forum rules directly conflict with the permissive venue provisions contained in the FAA. To the contrary, defense counsel conceded at oral argument that contractual provisions expressly limiting enforcement of an arbitration award to a particular forum are enforceable.

Defendants' claim of "obstacle" preemption fares no better. "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)) (alterations in *Hall St.*). It is this policy that informs the preemptive scope of the Act. As the Supreme Court has affirmed:

14

> While the FAA . . . pre-empts application of state laws which render arbitration agreements unenforceable, "[i]t does not follow, however, that the federal law has preclusive effect in a case where the parties have chosen in their [arbitration] agreements to abide by state rules."  To the contrary, because "[t]he thrust of the federal law is that arbitration is strictly a matter of contract," the parties to an arbitration agreement should be 'at liberty to choose the terms under which they will arbitrate."  Where . . . the parties have chosen in their agreement to abide by the state rules of arbitration, application of the FAA to prevent enforcement of those rules would actually be "inimical to the policies underlying state and federal arbitration law[] because it would force the parties to arbitrate in a manner contrary to their agreement."

*Volt*, 489 U.S. at 472 (citations omitted) (first, second, and third alterations in original); *see also id.* at 478–79.  Thus, even if a contract is covered by the FAA, if it "make[s] applicable state [or D.C.] rules governing the conduct of arbitration," those local rules are not necessarily preempted. *Id.* at 476; *see also Hall St. Assocs.*, 552 U.S. at 590 ("The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law . . . .").  This is because "[t]here is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."  *Volt*, 489 U.S. at 476.  If the parties in fact agreed to limit judicial review of the award to the D.C. Superior Court, that private agreement would not conflict with the policies embodied in the FAA, and their agreement should be enforced.  *See, e.g.*, *Foulger-Pratt Residential Contracting, LLC v. Madrigal Condos., LLC*, 779 F. Supp. 2d 100, 108–11 (D.D.C. 2011).

Finally, although D.C. Code § 16-4426(b) speaks in terms of the "exclusive jurisdiction" of the D.C. Superior Court, the Court does not understand that provision—or Equitas's argument—to purport to constrain the subject-matter jurisdiction of the federal district courts.  *See* Dkt. 14-1 at 7.  Rather, both the D.C. law and Equitas's argument are best understood to pertain to the proper *venue or forum* for judicial review of an arbitration award.  Obviously,

neither the states nor private parties may alter the subject-matter jurisdiction of the federal

courts.  For the reasons described above, however, parties to an arbitration agreement may either

directly, or through the incorporation of state law, agree that related litigation will be brought in

any forum of their choice, so long as that forum has jurisdiction to decide the dispute.

Accordingly, if the SACCA and FAASA incorporate D.C. Code § 16-4426(b), the *venue* rule

contained in that provision would not conflict with the FAA.

      2.    *Contract Interpretation*

      The question, then, is simply whether, as matter of contract interpretation, the SACCA

and FAASA incorporate D.C. Code § 16-4426(b), as Equitas contends.  That is, "the case . . .

comes down to what the contract has to say" about the proper forum for judicial review of the

arbitration award.  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58 (1995).

Three sentences contained in the "Governing Law; Dispute Resolution" provisions of the

contracts are most relevant to this question.  The first sentence states that "[t]his Agreement shall

be deemed to have been entered into under the laws of the District of Columbia, and the rights

and obligations of the parties hereunder shall be governed and determined according to the laws

of said state without giving any effect to conflict of laws."  Dkt. 9-2 at 39 (SACCA); *id.* at 57

(FAASA).  The second sentence provides for the application of the JAMS Streamlined

Arbitration Rules and Procedures.  *Id.*  And the final sentence states that "[j]udgment may be

entered into in any court of competent jurisdiction to enforce any final decision by the

arbitrators."  *Id.*  According to Equitas, by incorporating D.C. law, the first sentence incorporates

the DCRAA, including § 16-4426(b).  *See* Dkt. 14-1 at 6.  Defendants, in contrast, argue that the

parties were required to expressly opt out of the FAA if they wished to incorporate the DCRAA

and that, in any event, the second and final sentences provide that an action to enforce or to

vacate the arbitration award can be brought in *any* court with jurisdiction, not just the D.C. Superior Court.  The parties agreed at oral argument that there is no parol evidence that would elucidate the meaning of these provisions and the contracting parties' intent with respect to the proper forum for this action.

The Supreme Court's decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, provides a helpful starting point for construing the SACCA and FAASA.  In *Mastrobuono*, the Supreme Court construed "a standard-form contract that expressly provide[d] that it 'shall be governed by the laws of the State of New York.'"  *Id.* at 53.  Although the contract "contain[ed] no express reference to claims for punitive damages," *id.* at 59, under New York law, "the power to award punitive damages [was] limited to judicial tribunals and [could] not be exercised by arbitrators," *id.* at 55.  The arbitration clause of the contract also, however, "explicitly authorize[d] arbitration in accordance with [National Association of Securities Dealers ("NASD")] rules."  *Id.* at 60.  Under those rules, "arbitrators [could] award 'damages and other relief,'" which the Court construed as "broad enough at least to contemplate [punitive damages as] a remedy."  *Id.* at 61.  Thus, as in this case, *Mastrobuono* involved an arguable conflict between a general provision incorporating state law and other contractual language.

The *Mastrobuono* Court concluded that "[a]t most, the choice-of-law clause introduce[d] an ambiguity into an arbitration agreement that would otherwise [have] allow[ed] punitive damages awards," *id.* at 62, and that, given this ambiguity, "the best way to harmonize the choice-of-law provision with the arbitration provision [was] to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators," *id.* at 63–64.  So understood, the Court concluded that "the choice-of-law provision cover[ed] the rights and duties of the parties, while

the arbitration clause cover[ed] arbitration; neither sentence intrude[d] upon the other." *Id.* at 64. Thus, notwithstanding the inclusion of a provision in the contract incorporating New York law in general terms, the Court concluded that the contract did not incorporate New York law regarding arbitral awards of punitive damages. *Id.* at 55, 64.

Here, the first sentence of the SACCA and FAASA incorporating D.C. law presents a similar ambiguity, presenting two possible interpretations of the contract. On the one hand, the first sentence provides that D.C. law governs and, under D.C. contract law, "laws in effect at the time of the making of a contract form a part of the contract 'as fully as if they had been expressly referred to or incorporated in its terms.'" *Double H Hous. Corp. v. Big Wash, Inc.*, 799 A.2d 1195, 1199 (D.C. 2002) (quoting *Farmers & Merchs. Bank of Monroe v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 660 (1923)). But, on the other hand, this generally worded choice-of-law provision might also be construed, as in *Mastrobuono*, to incorporate only the "substantive principles that [D.C.] courts would apply" with respect to the parties' underlying contractual dispute, *Mastruobuono*, 514 U.S. at 64, and not to incorporate local procedural laws, *see Dalal v. Goldman Sachs & Co., Inc.*, 575 F.3d 725, 726 (D.C. Cir. 2009) (per curiam) (unpub.); *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1395 (D.C. Cir. 1995), or local laws specific to arbitration proceedings, *Contech Constr. Prods, Inc. v. Heierli*, 764 F. Supp. 2d 96, 107–108 (D.D.C. 2011); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 151–54 (D.D.C. 2004). As so construed, D.C. law would define "the rights and obligations of the parties *hereunder*," Dkt. 9-2 at 39, 57 (emphasis added)—that is, their substantive rights and obligations under the SACCA and FAASA—but not the procedures for enforcing or vacating a future arbitration award. *Cf. Mastruobuono*, 514 U.S. at 64.

18

Defendants argue that any ambiguity in the agreements favors their position because *Mastrobuono* and its progeny impose a clear-statement rule—a rule that to "opt-out" of the rules that would otherwise apply under the FAA, and to adopt the D.C. choice-of-forum rule in their place, the parties would have had to do so expressly. *See* Dkt. 15 at 3–6 & n.2 (citing *Contech*, 764 F. Supp. 2d at 108; *Jung*, 300 F. Supp. 2d at 151–54). It is true that "[n]umerous courts of appeals have concluded that *Mastrobuono* requires that the intent of the contracting parties to apply state arbitration rules or law to arbitration proceedings must be explicitly stated in the contract and that under *Mastrobuono*, a general choice of law provision does not evidence such intent." *Jung*, 300 F. Supp.2d at 152. That rule, however, is not as categorical as Defendants suggest. They are correct that *Mastrobuono* declined to apply New York arbitration law on punitive damages, at least in part, because the contract lacked "an *unequivocal* exclusion of punitive damages claims." 514 U.S. at 60 (emphasis added). But the Supreme Court's invocation of a clear-statement test was based on the premise that, "when a court interprets [an ambiguous] provision[] in an agreement covered by the FAA, 'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration.'" *Id.* at 62; *see also Jung*, 300 F. Supp. 2d at 153 & n.21 (relying on "the policies that heavily favor arbitration" to hold that "*Mastrobuono* requires" a clear-statement of intent to apply local arbitration law).

Unlike in *Mastrobuono*, the present dispute does not concern the scope of an arbitration agreement or the authority of an arbitrator to award relief. *Cf. Mastrobuono*, 514 U.S. at 62. Rather, the dispute is *which* court should decide the pending motions to vacate and to confirm, and, as explained above, the FAA's policy in favor of arbitration does not dictate a particular forum for judicial review of an arbitration award. Because the FAA's venue provisions are

permissive, *see Cortez Byrd Chips*, 529 U.S. at 198–204, the parties are free to choose any court with jurisdiction to address post-arbitration motions, and, in construing what they agreed to do, there is no basis for putting a finger on the scale in favor of a federal forum.  Thus, what the Court takes from *Mastrobuono* is simply that a generally worded choice-of-law clause in an arbitration agreement does not resolve the question whether the contract incorporates all relevant state law or only the rules defining the parties' substantive rights.  Resolution of that question, at least in the present context, does not turn on the application of a clear-statement rule, but rather on the language of the contract read "as a whole," *Mastrobuono*, 514 U.S. at 59 (quoting *Restatement (Second) of Contracts* § 202(2) (1979)), and settled rules of contract interpretation.[5]

Here, even in the absence of a clear-statement rule, the better reading of the contract is the one propounded by Defendants.  They contend that the second and final sentences of the Governing Law provisions of the SACCA and FAASA refute Equitas's claim of exclusive venue in the D.C. Superior Court.  Dkt. 15 at 4–5.  The Court disagrees as to the second sentence, but agrees with respect to the final sentence.  The second sentence states that the arbitration is to be "administered by and in accordance with the then existing JAMS Streamlined Arbitration Rules and Procedures."  Dkt. 9-2 at 39, 57.  Under those rules, judicial review of an arbitration award is

---

[5]  Among these rules, *Mastrobuono* relied on "the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it" as a tiebreaker.  514 U.S. at 62.  Here, however, the parties' agreements disclaim application of that doctrine.  *See* Dkt. 9-2 at 41 (SACCA) ("The parties have participated jointly in the negotiation and drafting of this Agreement . . . . [T]his agreement will be construed as if drafted jointly . . . ."); *id.* at 58 (FAASA) ("This Agreement will not be construed more strictly against any party regardless of who is responsible for its drafting."); *see also Aeroground, Inc. v. CenterPoint Props. Tr.*, 738 F.3d 810, 817 (7th Cir. 2013) (declining to construe agreement against drafter where contract included similar provision).  *But see* Dkt. 2-4 at 10 (arbitrator's finding that the SACCA "was drafted by Ed McGinty, a Florida lawyer who was not only retained by Equitas (or its predecessor) but who also had a financial interest in Mr. Abeles' enterprise").

available in "any court having jurisdiction thereof"—either in accordance with the FAA *or* in

accordance with state law.  Rule 20, JAMS Streamlined Arbitration Rules & Procedures.[6]

Defendants contend that this shows that judicial review of the arbitration award is not confined

to the D.C. Superior Court, but extends to any court with subject-matter jurisdiction.  *See* Dkt 15

at 4–5.  As Equitas points out, however, the very next sentence of the Governing Law provision

belies any claim that the JAMS Rules resolve the venue issue.  That sentence declares that "[t]he

provisions of this Agreement shall prevail in case of inconsistency between the Rules of

Arbitration and this Agreement."  Dkt. 18 at 3–4 (quoting Dkt. 2-4 at 42, 44).  Thus, to the extent

that the first sentence of the Governing Law provisions could be construed to incorporate the

venue rule found in D.C. Code § 16-4426(b), the incorporation of the JAMS Rules does nothing

to undercut that construction.

Defendants' argument premised on the final sentence of the Governing Law provisions,

however, fares better.  That sentence speaks directly to the question in dispute and states in

categorical terms that "[j]udgment may be entered into in *any* court of competent jurisdiction to

enforce any final decision by the arbitrators."  Dkt. 9-2 at 39, 57 (emphasis added).  Although

Defendants acknowledged at oral argument that this language constitutes boilerplate included in

many, if not most, arbitration agreements, it provides in plain—and specific—terms that judicial

review is available in *any* court of competent jurisdiction.  "Read naturally, the word 'any' has

---

[6]  JAMS Rule 20, *available at* http://www.jamsadr.com/rules-streamlined-arbitration/#Rule20,
provides in full:

> Proceedings to enforce, confirm, modify or vacate an Award will be controlled by
> and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. Sec 1, *et.*
> *seq.*, or applicable state law.  The Parties to an Arbitration under these Rules shall
> be deemed to have consented that judgment upon the Award may be entered in
> any court having jurisdiction thereof.

an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)).  And, while context matters, *see Small v. United States*, 544 U.S. 385, 388 (2005), Equitas offers no reason to give the word anything other than its natural meaning.  The final sentence, accordingly, provides that an arbitration award may be "entered"—that is, confirmed— in whatever court the moving party might select, so long as that court has jurisdiction.  Here, moreover, there is no dispute that the parties' dispute falls within this Court's diversity jurisdiction, and thus the final sentence of the Governing Law provisions confirms that Defendants acted within the plain terms of the SACCA and FAASA when they removed the action to this Court.

To be sure, the final sentence addresses motions to confirm awards, and not motions, like the one Equitas brought, to vacate an award.  But as the Supreme Court suggested in *Cortez Byrd*, it would make little sense to designate different tribunals for purposes of enforcing and vacating an arbitration award.  *See* 529 U.S. at 200–201.  Indeed, Equitas does not argue otherwise, nor could it given the fact that D.C. Code § 16-4426(b) is itself addressed to the proper court "to enter judgment on an" arbitration award.  Nor can Equitas reasonably argue that this is not a "court of competent jurisdiction" on the theory that D.C. Code § 16-4426(b) grants "exclusive jurisdiction" to the D.C. Superior Court.  As explained above, the Court understands the D.C. Code's reference to "exclusive jurisdiction" to refer to venue, not subject-matter jurisdiction.  If that language were construed otherwise, it would directly conflict with 28 U.S.C. § 1332, which grants the district courts jurisdiction in diversity cases, and would be preempted by federal law.  *See, e.g.*, *United States v. Peters*, 9 U.S. 115, 136 (1809).

This, then, leaves only the question whether the first and final sentences of the Governing Law provision conflict, and, if so, how that conflict should be resolved.  As in *Mastrobuono*, the Court concludes that any potential conflict can, and should, be avoided by construing the first sentence to identify the source of substantive law for purposes of the contract, but not to specify the procedures for enforcing or vacating an arbitration award.  *Cf. Mastrobuono*, 514 U.S. at 63–64.  As the Court put it in *Mastrobuono*, "a document should be read to give effect to all its provisions and to render them consistent with each other."  *Id.* at 63; *see also Abdelrhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013) ("When interpreting a contract, we 'strive to give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole.'" (quoting *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012)).  If the first provision confers exclusive jurisdiction on the D.C. Superior Court by operation of D.C. Code § 16-4426(b) as Equitas contends, there is no way to give the final sentence—and, in particular, the word "any"—a plausible meaning.

Equitas argues that "any court of competent jurisdiction" retains meaning under its interpretation because, under D.C. law, the parties could have agreed to a forum other than the Superior Court *after* the dispute arose.  *See* Dkt. 18 at 4 n.1 (citing D.C. Code § 16-4404(a)).  "It is an axiom of contract interpretation," however, that "the court should determine 'what a reasonable person in the position of the parties would have thought the disputed language meant.'"  *Foulger-Pratt*, 779 F. Supp. 2d at 110 (quoting *Steele Founds., Inc. v. Clark Constr. Group, Inc.*, 937 A.2d 148, 154 (D.C. 2007)).  Here, Equitas's construction is a stretch too far.  Although the parties could easily have done so, they did not say that an arbitration award could be enforced in "any court of competent jurisdiction *that the parties agree to after a dispute arises*."  Instead, they simply said "any" court with jurisdiction.  Limiting the reach of the final

provision to Equitas's construction might give that sentence *some* meaning—it might apply in unusual circumstances to more than a single court—but its construction would not give the sentence a meaning that comports with its plain terms.

Construing the final sentence to confirm that the parties may enforce or seek to vacate an award in any court with jurisdiction is also supported by another rule of construction—that "'specific terms and exact terms are given greater weight than general language.'" *Abdelrhman*, 76 A.3d at 891. Equitas relies on the first sentence of the Governing Law provisions, but that sentence provides for the application of D.C. law in general terms, without any reference to proceedings to review an arbitration award. The final sentence, in contrast, is addressed to one topic alone—the choice of forum for purposes of an action to enforce an arbitration award. Under the Court's construction of the SACCA and FAASA, "both the specific and general provisions [are] given reasonable effect, [and] both are . . . retained." *Id.* (internal quotation marks omitted). Even if these provisions were irreconcilable, moreover, the "specific clause[]"—the final sentence—would "prevail over [the] general clause[]"—the first sentence. *Id.* Under either construction, D.C. Code § 16-4426(b) is not incorporated into the contract and jurisdiction over this action is not limited to the D.C. Superior Court.

Finally, this construction is consistent with the cases relied upon by Equitas. Equitas is correct that in *Volt* the Supreme Court upheld the application of the California Arbitration Act's procedural provisions regarding stays of arbitration "in a case where the parties . . . agreed that their arbitration agreement [would] be governed by the law of California." 489 U.S. at 470. The question before the Court in *Volt*, however, was only whether the FAA categorically precludes parties from choosing state rules to govern an arbitration. *See id.* The Court, moreover, expressly stated that it was *not* reviewing the California Court of Appeal's finding that the

24

general choice-of-law provision incorporated the California rules of arbitration into the contract. *See id.* at 474.  Indeed, as the Supreme Court explained, that case came to it on review of a final judgment rendered by the highest court of a state, *see id.* at 473 n.4, and, although the proper interpretation of the FAA presented a question of federal law, "the interpretation of private contracts is ordinarily a question of state law, which th[e] [Supreme] Court does not sit to review," *id.* at 474.  Here, in contrast, the Court must construe the parties' contracts *de novo*.  *See Mastrobuono*, 514 U.S. at 60 n.4 (distinguishing *Volt* on this basis).

Equitas's reliance on *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2011), is similarly misplaced.  That case concerned whether the Potawatomi tribe waived its sovereign immunity "when it expressly agreed to arbitrate disputes with C & L relating to the contract, to the governance of Oklahoma law, and to the enforcement of arbitral awards 'in any court having jurisdiction thereof.'"  *Id.* at 414.  In addressing the sovereign-immunity question, the Court explained that "[t]he contract's choice of law clause makes it plain enough that a 'court having jurisdiction' to enforce the award in question is the Oklahoma state court."  *Id.* at 419.  This was because the arbitration provision provided for "arbitral awards [to] be reduced to judgment 'in accordance with applicable law in any court having jurisdiction thereof'" and, under Oklahoma law, the state court had such jurisdiction.  *Id.* The Court did not decide, and had no reason to decide, whether the arbitration award might also have been enforced in federal court; indeed, the Tribe's position was that "[n]o court—federal, state, or even tribal—ha[d] jurisdiction over [the] suit."  *Id.* at 421.  And it did not decide, and had no reason to decide, whether the general choice-of-law provision conflicted with some other contractual provision, like the specific forum-selection clause at issue here.

Finally, Equitas points to several district-court cases to support its position, but those cases are also readily distinguishable because they either expressly designate the D.C. Superior Court as the proper venue or expressly incorporate the DCRAA.  *See* Dkt. 14-1 at 3–4, 6.  In *Carmen Group, Inc. v. Xavier University of Louisiana*, for example, Judge Cooper of this Court held that a forum-selection clause stating that "venue . . . shall be the Superior Court of the District of Columbia" and that the parties "waive any objection to such venue" was sufficiently clear to "effect a waiver of the parties' removal rights."  41 F. Supp. 3d 8, 10–11 (D.D.C. 2014).  Similarly, in *Foulger-Pratt*, Judge Kessler concluded that a clause providing that "'[t]his [a]greement to arbitrate shall be specifically enforceable pursuant to and interpreted under the laws of the District of Columbia'" meant what it said, and that, accordingly, review of the arbitration award was properly conducted under D.C. law.  779 F. Supp. 2d at 110 (distinguishing *Mastrobuono* and concluding DCRAA applied because "[i]n this case, . . . the parties included a *specific* clause" providing for enforcement of the arbitration award under D.C. law (emphasis added)).  Neither conclusion is surprising or at odds with the conclusion that Equitas and Defendants expressly agreed that a proceeding to review the arbitrator's award could be brought in "any court of competent jurisdiction."

The parties could have included a provision in the SACCA and FAASA expressly designating the D.C. Superior Court as the exclusive forum for review of the arbitration award, but they did not.  The Court agrees with Defendants that to adopt Equitas's reading of the general D.C. choice-of-law provision as vesting exclusive venue in the D.C. Superior Court would be akin to "rewrite[ing] the agreements."  Dkt. 15 at 6.  The Court, accordingly, **DENIES** Equitas's motion to remand this action to the D.C. Superior Court.  *See* Dkt. 14.

## C.     Motion to Vacate

1. *Denial of Postponement*

Equitas contends that, in any event, it is entitled to vacatur of the arbitration award under either the DCRAA or the FAA because the arbitrator improperly denied its requests for a continuance of the arbitration hearing.  Dkt. 2-4 at 19–21.  For purposes of determining whether the arbitrator's denial of a postponement warrants vacatur of the arbitration award, it is immaterial whether the FAA or the DCRAA applies.  Under both statutes, "judicial review of arbitration awards is extremely limited."  *Foulger-Pratt*, 779 F. Supp. 2d at 113.  "Such extremely limited review 'serves to attain a balance between the need for speedy, inexpensive dispute resolution, on the one hand, and the need to establish justified confidence in arbitration among the public, on the other.'"  *Id.* at 114 (quoting *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 959 (D.C. 2008)).

Both statutes include denial of a postponement as a ground for vacatur.  Under the FAA, the court "may make an order vacating the award . . . where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown."  9 U.S.C. § 10(a)(3).  Under the DCRAA, "the court shall vacate an award . . . if . . . [a]n arbitrator refused to postpone the hearing upon [a] showing of sufficient cause for postponement."  D.C. Code § 16-4423(a)(3).  Notwithstanding the differences in language, courts apply the same deferential standard to determine whether denial of a postponement warrants vacatur under the FAA and the DCRAA.  *See Foulger-Pratt*, 779 F. Supp. 2d at 118, 120 n.23; *Naing Int'l Enterprises, Ltd. v. Ellsworth Assocs., Inc.*, 961 F. Supp. 1, 2 (D.D.C. 1997); *Capozio v. Am. Arbitration Ass'n*, 490 A.2d 611, 615–18 (D.C. 1985); *see also Hercules & Co. v. Beltway Carpet Serv., Inc.*, 592 A.2d 1069, 1073 (D.C. 1991) ("[F]ederal court decisions construing and applying the federal arbitration act may be regarded as persuasive authority in construing and applying the

corresponding provisions of the District of Columbia arbitration act, so long as there is no

material difference in the statutory language between the two acts.").[7]  Under both statutes,

> The arbitrary denial of a reasonable request for a postponement may serve as
> grounds for vacating an arbitration award.  However, arbitrators are to be
> accorded a degree of discretion in exercising their judgment with respect to a
> requested postponement.  Thus, if there exists a reasonable basis for the
> arbitrators' decision not to grant a continuance, the Court will be reluctant to
> interfere with the award on these grounds.  Nonetheless, if the failure of an
> arbitrator to grant a postponement or adjournment results in the foreclosure of the
> presentation of "pertinent and material evidence," it is an abuse of discretion.

*Naing Int'l Enterp.*, 961 F. Supp. at 3 (citations omitted) (applying the FAA); *see also Foulger-*

*Pratt*, 779 F. Supp. 2d at 118 (applying the same standard under the DCRAA).  The question,

accordingly, is not whether this Court might have exercised its discretion to grant a

postponement under the relevant circumstances, but whether the arbitrator's decision to deny the

continuance was unreasonable or an abuse of discretion.

Equitas contends that the arbitrator's denial of a postponement lacked a reasonable basis

because "Mr. Abeles had been diligent in notifying the case administrator of his need for new

counsel and the need for a continuance for well over a month in advance of the hearing."  Dkt. 2-

4 at 20.  But the fact that Abeles informally told the case administrator in mid-October 2014 that

counsel for Equitas intended to withdraw and that Equitas would need a postponement, Dkt. 2-4

at 25 (Abeles Aff. ¶ 15), does not explain Equitas's inability to obtain new counsel in time for

the December hearing.  The arbitrator found that "Mr[.] Abeles clearly had prior notice of

counsel's withdrawal," Dkt. 2-4 at 8, and this finding was supported by the record.  When

---

[7]   The D.C. Uniform Arbitration Act, the predecessor to the DCRAA, which some of the cases
cited above interpret, provided for vacatur based on denial of a postponement in terms materially
indistinguishable from the DCRAA:  "[T]he Court shall vacate an award where: . . . The
arbitrators refused to postpone the hearing upon sufficient cause being shown therefor . . . ."
D.C. Code § 16-4311(a)(4) (West 2007).

Equitas eventually filed a motion for a postponement just before Thanksgiving, it cited the departure of a "key member[] on [its] legal team" from Zuckerman Spaeder as the reason that it was necessary to adjourn the previously scheduled hearing. Dkt. 16-3 at 33. But, as Abeles admits, that person left the firm on July 1, 2014—a month and a half before the December hearing date was even set with the consent of the parties, and over five months before the hearing. Dkt. 2-4 at 25 (Abeles Aff. ¶ 13); *id.* at 46, 61. Moreover, Equitas learned that its lead attorney would leave in the middle of June 2014, Dkt. 2-4 at 61, and, as early as August 26, 2014, Zuckerman Spaeder withdrew from representing Equitas in closely related litigation, Dkt. 16-3 at 20–23.

In seeking a postponement, Equitas did not provide any description of its efforts since the summer to retain new counsel, and it did not offer any explanation why those efforts had proven unsuccessful or any indication of when it anticipated actually retaining new counsel. This was insufficient to show cause why, having been aware of the need to identify a new lead attorney for months, Equitas was unable timely to proceed with the hearing. This was not a case, moreover, where the need for new counsel arose suddenly and to the surprise of the client. To the contrary, Abeles simply asserts that over time he "became increasingly disenchanted with the attorneys handling [the] case." Dkt. 2-4 at 25 (Abeles Aff. ¶ 13). An unexplained "disenchantment" with one's counsel on the eve of trial, where the client had months to assess counsel's performance and to make a change if appropriate, does not—without more—establish good cause for an adjournment.

Abeles's only other explanation for Equitas's delay in identifying and retaining new counsel was that Defendants' "failure to pay JAMS fees . . . lull[ed] Equitas into thinking that it had time to obtain new counsel" and that "retaining new counsel would have been an unjustified

expense while it appeared that the [Defendants] were not willing to pay their share and proceed with the arbitration." Dkt. 2-4 at 60, 62. That contention, however, is in tension with Abeles's representation to the arbitrator that, "when one of the key members on [Equitas's] legal team left Zuckerman Spaeder," Equitas "*immediately* began exploring [its] options and conferring with other counsel" but had "not yet complete[d]" the process by the time it sought the continuance. Dkt. 16-3 at 33 (emphasis added). And, even more to the point, it is difficult to square with the timeline. Abeles asserts that he did not learn that Defendants had failed to pay their share of the arbitration fees until the last week of October, at the same time that he was purportedly told by the case manager that the hearing would "likely" be canceled."[8] Dkt. 2-4 at 25–26 (Abeles Aff. ¶ 16), 62. But he also concedes that on October 30, 2014, JAMS informed him that Defendants would have until November 7, 2014 to pay their share of the fees and that *if they failed to do so*, the hearing would be canceled, *id.* at 48; *see also id.* at 26 (Abeles Aff. ¶ 17). And there is no dispute that Defendants did, in fact, pay the required fees on November 7. *Id.* at 26 (Abeles Aff. ¶ 19).

As a result, (1) any confusion about whether the hearing would be canceled due to non-payment could not have prevented Equitas from locating new counsel between the middle of June and the end of October; (2) by the end of October, Equitas was on formal notice that the fee issue would not prevent the hearing from going forward if Defendants paid their share of the fees by November 7; and (3) the Defendants, in fact, paid the fee by the November 7 deadline. Thus, even viewed in the light most favorable to Equitas, the record reflects that it waited months to locate replacement counsel and that, even if it—*briefly*—delayed its search for new counsel in

---

[8]  In a roughly contemporaneous email that Abeles sent to the case administrator, he describes her assessment of the situation somewhat less affirmatively, noting that she merely said that "it was quite plausible the entire Arbitration would be cancelled." Dkt. 2-4 at 51.

late October and early November, it did so with the knowledge that Defendants would not be precluded from going forward if they paid the fees by November 7.  The timeline also provides no explanation at all for why, after learning that Defendants had paid, Equitas waited until November 26 (Thanksgiving eve) to ask the arbitrator to postpone the hearing—even though it was informed at the time that the hearing was scheduled that "[a]ny cancellation or continuance must be approved by the arbitrator."  Dkt. 16-3 at 14.  Under these circumstances, the Court cannot conclude that the arbitrator acted arbitrarily or unreasonably in finding that Equitas had not shown "sufficient cause" for a postponement.  *See* Dkt. 2-4 at 8.

Equitas goes on to argue that the arbitrator should have at least "inquir[ed] as to whether Equitas would pay [the] costs [of a continuance] (including cancellation fees payable to the Arbitrator himself)" instead of denying outright the request for a postponement.  *Id.* at 20.  Although Defendants opposed a postponement, they argued that if one was granted, Equitas should be responsible for such costs.  *Id.* at 58.  But Defendants never agreed to a postponement, even on the condition that Equitas pay their costs.  Nor did Equitas ever indicate that this alternative was acceptable to it.  To the contrary, it replied only that it was entitled to a postponement and that Defendants' costs were "de minimis" relative to the harm caused to it by Defendants' alleged breach of its obligations under the SACCA and FAASA.  *Id.* at 63.  The arbitrator was under no obligation to inquire into Equitas's willingness to pay for the costs associated with a postponement, particularly after Equitas replied dismissively to Defendants' contention that it should.  And, even if Equitas was willing to pay for a postponement, it was still reasonable for the arbitrator to conclude that Equitas had not shown sufficient cause to justify further delay of the proceedings.

Finally, Equitas contends that "failure to grant the continuance was exacerbated by the fact that, during the course of the proceeding, [Defendants] presented false or misleading testimony, knowing that Mr. Abeles was not in a position to rebut it." *Id.* at 21. Notwithstanding the "degree of discretion" afforded to arbitrators "in exercising their judgment with respect to a requested postponement," if a denial "results in the foreclosure of the presentation of 'pertinent and material evidence,' it is an abuse of discretion." *Naing Int'l Enterp.*, 961 F. Supp. at 3 (citation omitted). This is because "neither this Court nor the arbitration panel can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one." *Id.* at 5.

Equitas, however, has not shown that it was prevented from presenting any such evidence. Abeles asserts that, during the hearing, Defendants' "witnesses repeatedly made statements that [he] knew to be untrue," including statements "relating to whether specific cases were within the scope of the agreements at issue in the arbitration." Dkt. 2-4 at 29 (Abeles Aff. ¶ 30). But Abeles did cross-examine the Defendants' witnesses at the hearing, although, according to the arbitrator, he did not do so "effectively." *Id.* at 9. The arbitrator concluded, at any rate, that Abeles's inability to conduct an effective cross-examination did "not devalue or impeach the testimony of" a key witness, "a non-party witness who was Mr[.] Abeles' former business associate in Equitas and who reaffirmed an earlier affidavit that set forth his understanding that Equitas would not share in the fees earned by [Defendants] on 'every disability case they ever had.'" *Id.* at 9–10. Equitas, in turn, does not rebut this conclusion or, indeed, offer any description of what further impeachment evidence it was prevented from presenting, contending only that Abeles "had documents" that would have defeated Defendants' argument regarding the interpretation of the contracts. *Id.* at 29 (Abeles Aff. ¶ 30). Without a

proffer of the evidence that Equitas would have presented, there is no basis on which the Court

could conclude that Equitas was prevented from presenting "pertinent and material" evidence.

*Cf. Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400 (5th Cir. 2006) ("Absent even a

representation that the materials [plaintiff sought additional time to review] were important to his

case or that a continuance might have altered the outcome of the arbitration, we cannot conclude

that [plaintiff] was deprived of a fair hearing.").  And, without an explanation of why Abeles

could not himself present those documents at the hearing or afterward, the Court cannot conclude

that the denial of a postponement foreclosed the presentation of any evidence—material or

otherwise.  The arbitrator permitted the parties to submit further evidence until December 12,

Dkt. 2-4 at 8, and, as defense counsel conceded at oral argument, Equitas did so.

There is no authority, moreover, for the proposition that an arbitrator must indefinitely

delay proceedings to accommodate a party who dismisses its counsel and then dawdles in

obtaining new counsel.  In *Fairchild & Co., Inc. v. Richmond, Fredericksburg & Potomac

Railroad Co.*, for example, the plaintiff alleged that, due to a withdrawal of counsel, it "was

unable to secure adequate legal representation . . . until shortly before" the proceedings were

commenced and that "a postponement [was] necessary to permit it to adequately prepare for the

hearing."  516 F. Supp. 1305, 1313 (D.D.C. 1981).  Another judge of this court affirmed the

arbitrator's conclusion that the plaintiff "had had ample time to secure adequate legal

representation and prepare" and that its "arguments in support of its request did not justify a

substantial delay in the resolution of the case."  *Id.* at 1314.  Indeed, some courts have even held

that arbitrators do not abuse their discretion in denying a postponement when the result is that the

arbitration hearing is held entirely *ex parte*.  *See, e.g.*, *Capozio*, 490 A.2d at 614–617; *Scott v.

Prudential Secs., Inc.*, 141 F.3d 1007, 1010, 1017 (11th Cir. 1998).  Here, in contrast, the

arbitrator had the benefit of briefing on the construction of the parties' agreements that was submitted prior to Zuckerman Spaeder's withdrawal from the case, and Abeles participated in the hearing on Equitas's behalf.  *See* Dkt. 2-4 at 8.

"[A]rbitrators are given a great deal of latitude in conducting arbitration proceedings, and based upon the record, the Court cannot find that the arbitrator['s] conduct constituted misconduct nor can the Court find on this record that there was even an abuse of discretion by the arbitrator[]."  *Berlacher v. PaineWebber Inc.*, 759 F. Supp. 21, 24 (D.D.C. 1991).  "This is particularly so in view of the fact that [Equitas] . . . had itself made a formal demand for arbitration, yet purportedly remained unprepared for a hearing nearly [twelve] months after that demand."  *Fairchild*, 516 F. Supp. at 1314.  The Court, accordingly, **DENIES** Equitas's motion to vacate the arbitration award.

2.    *Timeliness*

Given this conclusion, the Court need not reach Defendants' alternative argument that Equitas' motion to vacate the arbitration award is untimely under the FAA, which requires that a motion to vacate an arbitration award "be served upon the adverse party or his attorney within three months after the award [was] filed."  9 U.S.C. § 12; Dkt. 16-1 at 3–4.  If Defendants' timeliness defense called the Court's jurisdiction into question, the Court would, of course, need to address it, and, indeed, could not have decided the preceding issue in the absence of jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  But it does not. As the Supreme Court has explained, even though courts "have occasionally described a nonextendable time limit as 'mandatory and jurisdictional,'" recent caselaw clarifies that "time prescriptions, however emphatic, are not properly typed 'jurisdictional'" in the sense of restricting courts' subject-matter jurisdiction.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006)

(citations and some internal quotation marks omitted).  Rather, "when Congress does not rank a statutory limitation . . . as jurisdictional, courts should treat the restriction as nonjurisdictional in character."  *Id.* at 516.  That is the case with § 12 of the FAA.  That provision says nothing about the jurisdiction or the authority of the district courts, but rather—like a statute of limitations—merely prescribes the time the moving party has to initiate an action challenging an arbitral award.  Given that the Court need not reach the issue to dispose of the pending motion, the Court declines to decide whether Equitas's motion to vacate was timely.

**D.      Motion to Confirm**

Under both the FAA and DCRAA, the Court must grant a motion to confirm an arbitration award once it denies a motion to vacate.  *See* 9 U.S.C. § 9 ("[T]he court must grant [an application for an order confirming the award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 . . . ."); D.C. Code § 16-4423(e) ("If the court denies a motion to vacate an award, it shall confirm the award unless a motion to modify or correct the award is pending.").  Equitas asserts that, even if the Court denies the motion to vacate, it should decline to confirm the arbitration award as a sanction for Defendants' "blatant forum[] shopping" in filing the Massachusetts action to confirm the arbitration award.  Dkt. 21-1 at 2.  Equitas's claim of misconduct is difficult to square with the order of the Massachusetts court observing that "nothing prohibits this court from confirming an arbitration award from the District of Columbia."  Dkt. 16-3 at 46.  But, even if the Court agreed with Equitas's characterization of Defendants' conduct, Equitas fails to cite any authority for the proposition that the Court may decline to confirm an arbitration award on this basis.  *See Hall St. Assocs.*, 552 U.S. at 587 ("There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions

applies."); *A1 Team USA Holdings, LLC v. Bingham McCutchen LLP*, 998 A.2d 320, 326 (D.C. 2010) (rejecting argument that DCRAA "broaden[s] judicial review of arbitral awards" beyond "the traditional limited or extremely limited standard").  Having denied Equitas's motion to vacate the arbitration award, the Court, accordingly, **GRANTS** Defendants' motion to confirm it. Dkt. 17.

## III.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's motion to remand the case, Dkt. 14, is **DENIED**; Plaintiff's motion to vacate the arbitration award, Dkt. 2-4 at 4, is **DENIED**; and Defendants' motion to confirm the arbitration award, Dkt. 17, is **GRANTED**.  A separate Order will issue.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 29, 2016